[Cite as *State v. Sain-Dunham*, 2024-Ohio-3214.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29955 |
| | : | |
| v. | : | Trial Court Case No. 2023-CRB-002847 |
| | : | |
| QUINCE T. SAIN-DUNHAM | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 23, 2024

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant

ALISSA SCHRINER, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Defendant-Appellant Quince T. Sain-Dunham appeals from his convictions for violating a protection order and disorderly conduct. For the reasons outlined below, we affirm the judgment of the trial court.

## I.     Factual Background and Procedural History

{¶ 2} P.D. had resided at an address on West Second Street since 2011; only she possessed keys to the residence and received the utility bills. Sain-Dunham was a part owner of the West Second Street property, sharing ownership with P.D. and two other people.

{¶ 3} On July 27, 2023, P.D. obtained a civil stalking protection order (CSPO) under R.C. 2903.214 against Sain-Dunham after two incidents in which he first forced his way into the West Second Street house and threatened to kill her and later used a crutch to shove her and then struck her with it. The CSPO ordered Sain-Dunham to: not enter P.D.'s residence, including the building, grounds, and parking lots; not interfere with P.D.'s right to occupy the residence; stay away from P.D. and not be present within 500 feet of her wherever she may be or any place that she was likely to be; and not initiate or have any contact with P.D. or her residence for a period of one year.

{¶ 4} On July 30, 2023, P.D. returned to the West Second Street property to check on the house and to collect personal property. When she arrived, she heard Sain-Dunham talking on the phone at the back of the house, and she called the police. When the police arrived, P.D. told them that she had a CSPO against Sain-Dunham. The officers found Sain-Dunham on the back patio surrounded by empty food bags and personal care items. As officers approached him, Officer Bailey Jones asked Sain-Dunham to put his hands behind his back, but he refused. Additional officers arrived, and they forcibly put Sain-Dunham's arms behind his back and carried him to a cruiser while he was screaming and using abusive language toward them.

{¶ 5} Sain-Dunham was charged with one count of violating a protection order in violation of R.C. 2919.27(A)(2); one count of disorderly conduct in violation of R.C. 2917.11(A)(2); one count of resisting arrest in violation of R.C. 2921.22(A); and one count of obstructing official business in violation of R.C. 2921.31. On August 23, 2023, the matter proceeded to a bench trial.

{¶ 6} At trial, P.D. testified that, because Sain-Dunham had not stayed away from the West Second Street property in the past as she had requested, she began staying at an apartment; she did not feel safe at the house. However, she still paid the bills on the property and kept her belongings there.

{¶ 7} Sain-Dunham testified that, despite his being a part owner of the house, he knew that P.D. lived there, and he never had a key to the home or slept in the home except on one occasion when he had a locksmith let him inside the house. At some point following the incidents at the house which led P.D. to seek the CSPO, Sain-Dunham went to a hospital, but he later returned to the property because he had nowhere else to go and could not afford to pay rent elsewhere. He claimed that he had tried to comply with the officers' orders on the day he was arrested for violating the CSPO, but he simply moved too slowly because of his medical issues and screamed because he was in pain. He admitted to yelling rude and abusive statements at the officers but claimed that he made those statements because the officers wanted to "criminalize" him and were not giving him consideration. He also admitted that he had been served with the CSPO but did not believe that it was properly in his name.

{¶ 8} Officer Jones testified that, after being dispatched to the house and learning

that P.D. had a protection order against Sain-Dunham, she and her partner approached the rear of the house and found Sain-Dunham on the back patio. Jones instructed Sain-Dunham to put his arms behind his back, which he refused to do. Jones then tried to place Sain-Dunham's left arm behind his back, but he resisted. Sain-Dunham suggested to Jones that he lived there but that he had the protection order paperwork.

**{¶ 9}** The trial court also heard several sections of the responding officers' body camera footage and cruiser camera footage in which Sain-Dunham was heard yelling at the officers and using profanity and abusive language toward them.

**{¶ 10}** The trial court found Sain-Dunham guilty of violating a protection order and disorderly conduct but not guilty on the other two charges. He appeals.

## II. Assignments of Error

**{¶ 11}** Sain-Dunham asserts the following sole assignment of error:

SAIN-DUNHAM'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 12}** Sain-Dunham was charged with violating a protection order under R.C. 2919.27(A)(2), which states:

No person shall recklessly violate the terms of any of the following:

. . .

(2) A protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code;

He was also charged with disorderly conduct under R.C. 2917.11(A)(2), which provides:

No person shall recklessly cause inconvenience, annoyance, or alarm to

another by doing any of the following:

. . .

(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;

"A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 13} Sain-Dunham contends that his convictions for violating a protection order and disorderly conduct were against the manifest weight of evidence. First, he argues that he did not violate the CSPO when he was on the back patio of the West Second Street property because he is a part owner of the property and believed that P.D. was no longer there. Second, he contends that his conduct was not disorderly but, rather, he was just moving slowly due to his medical issues and was screaming because of his chronic pain.

{¶ 14} A manifest weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagel*, 1996 WL 501470 (2d Dist. Sept. 6, 1996). "[W]hen reviewing an

argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Sheeders*, 2019-Ohio-3120, ¶ 28 (2d Dist.), citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

**{¶ 15}** In the instant matter, the CSPO specifically ordered Sain-Dunham not to enter P.D.'s residence, including the building, grounds, and parking lots, not to interfere with P.D.'s right to occupy the residence, to stay away from P.D. and not be present within 500 feet of her, and not to initiate or have any contact with P.D. or her residence. Sain-Dunham acknowledged his receipt of the protection order despite claiming that the order reflected the wrong name. When pressed by the trial court on his claim that the name was wrong, he admitted he understood that the order was directed at him.

**{¶ 16}** The record demonstrates that Sain-Dunham violated several sections of the CSPO by entering the grounds of P.D.'s residence, living on her back patio, by being within 500 feet of P.D. or any place he knew or should have known that she was likely to be, and by generally having contact with P.D.'s residence. Sain-Dunham admitted that P.D. lived at the house and that he never had a key to or slept at the house, but he nonetheless returned to the property because he had nowhere else to go and could not afford to pay rent elsewhere. Even if Sain-Dunham was on the deed to the property as a part owner, he was not permitted to return to the property while the protection order

against him remained in place as long as it was P.D.'s residence. Under these circumstances, the record does not support a conclusion that the trial court lost its way in arriving at its verdict and created such a manifest miscarriage of justice that Sain-Dunham's conviction must be reversed and a new trial ordered. Thus, Sain-Dunham's conviction for violating a protection order was not against the manifest weight of the evidence.

{¶ 17} Similarly, the record does not support a conclusion that the trial court lost its way and created a manifest miscarriage of justice in convicting Sain-Dunham of disorderly conduct. It is undisputed that Sain-Dunham was screaming and yelling rude and abusive statements at the officers during his arrest. In several sections of the responding officers' body camera and cruiser camera videos, Sain-Dunham could be heard yelling at the officers and using profanity and abusive language toward them, making their jobs more difficult and creating an annoyance. Although he claimed that he was screaming due to pain, he also admitted that he made the offensive statements because the officers wanted to "criminalize" him and were not giving him consideration. Thus, we cannot say Sain-Dunham's conviction for disorderly conduct was against the manifest weight of the evidence.

{¶ 18} Sain-Dunham's sole assignment of error is overruled.

### III.    Conclusion

{¶ 19} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.